.𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

TOWNSEND AND OTHERS v. NORFOLK RAILWAY & LIGHT
COMPANY.

January 18, 1906.

Reheard, February 23, 1906.

1. STREET RAILWAYS—*Power House—Location—Nuisance—Injury to Adjacent Property.*—An electric street railway company is, under the terms of the Constitution of this State, a public service corporation. As such it has duties both of a public and of a private nature. In the operation of its cars in the transportation of freight and passengers it exercises a public duty, and if an injury is inflicted on another in doing what by law it may be required to do, and doing it without negligence, it is *damnum absque injuria;* and while an electric railway cannot be operated without a power house, still the selection of a site for the power house and the generation of power to propel its cars is the mere private business of the company with which the public has no concern. Such location is a matter of indifference to the public, and, in making it, the company stands on the footing of an individual, and is not entitled to any superior immunities. The grant of legislative and municipal authority to construct and operate its road in a city, does not confer authority to locate a power house where it would be a nuisance, nor authorize the company to molest or to injure the property of others by the operation of a power house, although operated without negligence. If injury to others is inflicted by the operation of such power house the company is liable.

ON REHEARING.

2. NUISANCE—*Electric Power—Legislative Authority—Privilege—Public Duty.*—Legislative authority to a company to establish and maintain the business of a general railway and electrical company, and to erect, maintain and operate plants for the generation of electricity for its own use and for sale to other persons, does not au-

thorize the establishment of such plants wherever the company may choose to place them, without reference to the property or rights of others. The right to erect such plant, by whatever name it be called, is a mere privilege and is not imposed as a duty. To escape liability for a nuisance created in the performance of an act authorized by the Legislature, it must appear that the particular act complained of, and immunity from its consequences, were within the contemplation of the Legislature. Damage occasioned by the location of a power house does not stand on the same footing as damage resulting from the operation of a railway along an authorized route. The power house can be placed where it will not be a nuisance while the railway must pursue the authorized route. The location of the power house is the exercise of a privilege to be enjoyed in such a manner as not to injure others. The operation of the railway, when once undertaken, is a public duty, and if carefully performed, no action lies, although damage may be suffered.

3. JUDICIAL OPINIONS—*Interpretation—Particular Facts.*—All opinions are to be considered in the light of the facts to which they apply. So reading *Fisher* v. *Railway Co.*, 102 Va. 363, it is not in conflict with the case at bar.

4. APPEAL AND ERROR—*Granting Writs of Error—Injunctions.*—It is the duty of this court to grant a writ of error prayed for unless the decision called in question is plainly right, and it is equally its duty to refuse an injunction which has been refused by an inferior court unless there was manifest error in refusing it. *Makeley v. Railway Co.* (not reported) affirmed.

Error to a judgment of the Circuit Court of the city of Norfolk in an action of trespass on the case. Judgment for the defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Tazewell Taylor* and *Theodorick A. Williams,* for the plaintiffs in error.

*W. H. Venable* and *White, Tunstall & Thom,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

The plaintiffs in error brought an action of trespass against the Norfolk Railway and Light Company, and their declaration states: That they were seized and possessed, as joint owners, of a certain lot of land, with the buildings and improvements thereon, situated on the west side of Cumberland street, in the city of Norfolk, Virginia; that the Norfolk Railway and Light Company, a corporation organized under the laws of the State of Virginia, owned a certain lot in the city of Norfolk, fronting on Cove street; that the defendant had erected on this lot a power house, equipped with large and heavy machinery, consisting of boilers, engines, dynamos, condensers and generators, for the purpose of generating electric power, and as a part of its equipment of said power house had erected in connection with its buildings three or more metal stacks; that it was the duty of the defendant so to maintain and operate its power house and plant as not to injure or interfere with the comfort, use and enjoyment by the plaintiffs of their property; but disregarding its duty in this behalf, on the first day of August, 1902, and on divers other days prior thereto and continuously up to the present time, the defendant did so wrongfully and unjustly operate and conduct its plant, or power house, that large columns of smoke, dust, cinders, sparks and soot had been emitted from the stacks of the defendant, and thrown, propelled, and hurled against, upon and through the houses of the plaintiffs on the property aforesaid, thereby preventing its proper and useful enjoyment by the plaintiffs; that their property had been made untenantable, and that its rental and salable value had been depreciated; that the houses of the plaintiffs upon their property, as aforesaid, had been and were being greatly shaken and damaged, in such a manner as to cause the same to become and be uncomfortable, dangerous, and uninhabitable; that by reason of the premises the property of the plaintiffs had deteriorated in value, both

as income-producing and as marketable property; and, further, that the defendant, by allowing the electric current from the wires and conduits, or on return circuit, to escape from its wires, or returning by ground circuit, to run over and through the pipes of metal placed to carry water and gas to the houses of plaintiffs, has caused the metal pipes, thus acting as conductors of electricity, to be eaten up and destroyed; and that although the defendant has been often requested by the plaintiffs to refrain and desist from the wrongful and unjust operation and management of its said plant, or power house, in the several ways hereinbefore described, yet it has refused to desist from the said wrongful and unjust operation and management of its plant, as aforesaid, to the damage of the plaintiffs $2,000.

To this declaration the defendant filed a special plea, in which it sets out that, before the time of the committing of the alleged grievances in the declaration mentioned, the General Assembly of Virginia had passed an act to incorporate the Virginia Electric Company, by which it was provided that it should have power to construct, lease, purchase or acquire by consolidation with any other company or companies, and operate and maintain in the city of Norfolk, suitable works, machinery, or plants, for the manufacture of electricity, and for the sale and distribution of the same; that it should have power to sell and distribute the same for public or private illumination, for heating and for power, and for any other purposes which the same might be used for; that it should have power to do such acts and things, and conduct such enterprises as might be convenient in connection with or incidental to the enjoyment of the powers thereinbefore conferred; and that it might, with the consent of the proper authorities of the city of Norfolk, use the streets and roads thereof for laying its mains, pipes, wires, and erecting its poles; that by an act of the Legislature, entitled "An Act to in-

corporate the Old Dominion Electrical Development and Power Company," it was provided that the said Old Dominion Electrical Development and Power Company should have power to erect, maintain and operate plants in this State for the generation of electricity and the supply of electric current for its own use and for sale to persons, natural or artificial, desiring to use the same for heat, light or power, or any and all uses to which the electric current might then or at any time thereafter be applicable, and might manufacture, use and sell, distribute and furnish the same for said purposes, and all electrical supplies of all kinds, to all and any persons and corporations, upon such terms as might be agreed upon by and between the contracting parties; that by the seventh section of the act last above mentioned, it was provided that the Board of Directors of the Old Dominion Electrical Development and Power Company should have the power to change the name of that company and to adopt such other name as they might deem proper upon the fulfillment of certain specified conditions; that in pursuance of said power the Board of Directors changed the name of the Old Dominion Electrical Development and Power Company, so that it became and was the Norfolk and Ocean View Railway Company; that said last mentioned company, by virtue of the powers granted to it by its acts of incorporation, acquired the works, property, rights, privileges and franchises of the Virginia Electric Company; and that said Norfolk and Ocean View Railway Company thereby became and was entitled, empowered and authorized to do and perform .any, all and singular, the acts referred to in the act of incorporation of the Virginia Electric Company, as well as any, all and singular the acts requisite, necessary or proper in connection with the powers, privileges and rights of the said company in the matter of carrying on the business of the said company. The plea further avers that on the 2d day

of November, 1899, by an agreement entitled "Agreement of consolidation of the Norfolk Street Railroad Company and the Norfolk and Ocean View Railway Company under the name of the Norfolk Railway and Light Company," the said Norfolk Railway and Light Company became and was possessed, and still is possessed, of any, and all and singular, the rights, franchises, privileges, powers, works, properties, and all other interests of any sort whatever of the said constituent companies, the Norfolk Street Railroad Company and the Norfolk and Ocean View Railway Company, and especially and particularly the particular powers, privileges and rights hereinbefore more fully specified as to the operation and maintenance of the plants of the said companies; that under the said consolidation agreement the defendant became and was possessed, and still is possessed, of the said plant, power house and manufactory, which is the same plant, power house and manufactory as are complained of in the declaration of the plaintiffs; that not only has it obtained legislative sanction and authority for the operation of the said plant, power house and manufactory, machinery and boilers, but that furthermore, at divers times, the defendant has obtained permission and authority from the councils of the city of Norfolk to install the said machinery and boilers in its power house and manufactory; and further avers that, pursuant to the legislative and municipal authority had and obtained. as aforesaid, it has ever since operated, and still continues to operate, its said plant in a proper, careful, reasonable, and suitable manner; that it is necessary to the proper carrying on of defendant's business to operate and maintain the said power house, manufactory and plant in the manner in which it has been, and is being, operated; and that it has done no damage and occasioned no discomfort that is not the natural, proximate, inevitable and necessary result of such proper, careful, reason-

able and suitable operation, without this that the said defendant is guilty of the said supposed grievances, or any of them, in manner and form as the said plaintiffs hath above thereof complained, and of this it puts itself upon the country.

The plaintiffs demurred to this special plea, and that demurrer was overruled by the court. And the plaintiffs not withdrawing, nor desiring to withdraw, their demurrer, the court gave judgment in favor of the defendant.

Section 153 of the Constitution declares, that the term "public service corporation" shall include "all transportation and transmission companies, all gas, electric light, heat and power companies, and all persons authorized to exercise the right of eminent domain, or to use or occupy any street, alley or public highway, whether along, over, or under the same, in a manner not permitted to the general public."

Under the terms of this definition it is apparent the Norfolk Railway and Light Company is to be deemed a public service corporation.

It will be observed that the declaration nowhere states that the injury of which the plaintiffs complain was caused by any negligent act upon the part of the defendant. The contention of plaintiffs is that in the operation of its plant the defendant wrongfully caused smoke, dust, cinders, sparks and soot from its chimney stacks to be thrown and propelled upon and through the houses of the plaintiffs; that by the operation of its heavy machinery it caused the houses of the plaintiffs to be greatly shaken and damaged; and that by permitting the electric current from its wires and conduits, or on return circuit to escape from its wires, or returning by ground circuit, to run over and through the pipes placed to carry water and gas to the houses of plaintiffs, the pipes had been eaten up and destroyed; and

the useful and proper enjoyment of the property been impaired; it had been rendered untenantable and its value diminished.

The defendant replies that it has operated, and continues to operate, its plant in a proper, careful, reasonable and suitable manner, in pursuance of legislative and municipal authority conferred upon it.

The question, therefore, for us to consider, is, whether or not the court erred in overruling the demurrer to this plea.

The declaration sets forth a nuisance; the defendant justifies what it has done by pleading legislative authority for its acts.

A public service corporation is to be considered in two aspects. It has duties which it owes to the public, and which it must perform; it has other duties not of a public nature, which are incidental to those of a public character, in the performance of which it stands upon the footing of a private corporation. With respect to the duties of the first class, it may be said that in doing that which under the law it may be required to do, it cannot be considered as doing an unlawful act; and if a lawful act be done without negligence, any injury which it occasions is *damnum absque injuria.*

This aspect of the case was before this court in *Fisher* v. *Seaboard Air Line Railway Co.,* 102 Va. 363, 46 S. E. 381, where it was said, that a railroad company acting under authority of law, whose road is constructed and operated with judgment and caution, and without negligence, is not liable to an adjacent landowner for damages resulting from noises, jarring and shaking of buildings, dust and smoke incident to the running of trains; for no action lies for the loss or inconvenience resulting from doing an authorized act in an authorized way. To the authorities relied on in support of this case many others may be added.

*Beseman* v. *Pennsylvania Railroad Co.,* 13 Atl. 164, from the Supreme Court of New Jersey, is strikingly in point. That was a suit for damages done to the houses and lands of plaintiff by the running of defendant's trains, to which the defendant replied that it acted under franchises derived from the public grant, and that it had built its road and run its trains, carrying merchandise and freight, near to the lands of the plaintiff, doing the plaintiff no more damage than that which necessarily resulted from the transaction of such acts and business; and that for such incidental and unavoidable damage it was not responsible. The plaintiff contended that with respect to private property a railroad is *per se* a nuisance whenever it throws a detriment, such as would be actionable at common law, on such property. Upon this the court said: "That this proposition, on which the plaintiff's case rests, is a most momentous one, is at once apparent. If it should be sustained, an illimitable field of litigation would be opened. If a railroad, by the necessary concomitants of its use, is an actionable nuisance with respect to the plaintiff's property, so it must be as to all other property in its vicinity. It is not only those who are greatly damnified by the illegal act of another to whom the law gives redress, but its vindication extends to every person who is damnified at all; unless, indeed, the loss sustained be so small as to be unnoticeable by force of the maxim *de minimis non curat lex.* The noises and other disturbances necessarily attendant on the operation of these vast instruments of commerce are wide-spreading, impairing in a sensible degree some of the usual conditions upon which depend the full enjoyment of property in their neighborhood; and consequently, if these companies are to be regarded purely as private corporations, it inevitably results that they must be responsible to each person whose possessions are thus molested. Such a doctrine would make

these companies, touching such land-owners, general tort-feasors. Their tracks run for miles through the cities of the State, and every land-owner on each side of the track would be entitled to his action; and so, in the less populated districts, each proprietor of lands adjacent to the road would have a similar right; and thus the litigants would be numbered by thousands. It is questionable whether the running of railroads would be practicable if subjected to such a responsibility. Nor is this susceptibility to be sued on all sides the only, or even the worst, consequence of the theory in question; for, if these rights of action exist, it follows, necessarily, that each of the persons in whom they are vested can prevent the continuance of the wrong out of which such rights of action arise. If this plaintiff should recover two or three verdicts against the defendant because of the damage that is inseparable from the running of its trains, there is plainly no ground on which the chancellor could refuse to enjoin a continuance of the nuisance. Nor does there appear to be any relief from such a consequence; the aggrieved landowner would be the master of the situation; for there is no law by force of which the company could take his land *in invitum,* or compel him to have his damages assessed once for all. In short, the plaintiff's claim involves the assertion that he can put a stop to the business of the defendant at the point in question." In concluding his opinion, the learned judge says: "I find no embarrassment in disposing of the present subject, for I have put railroads in the category of public agents, and have regarded them as possessed of all the immunities, in the particular in question, belonging to such an office."

That railroad corporations—public service corporations—are in many aspects to be regarded as *quasi* public corporations, can no longer be doubted. Upon that theory their duties are measured and their rights determined; and the control which the

State asserts, the exercise of which is becoming more and more necessary with the growth and development of our transportation system, of which railroads constitute so essential a part, rests upon the public character of such corporations. A railroad, in the operation of its trains in the transportation of freight and passengers, is in the exercise of a public duty, and should be permitted to apply the same principles of construction when it pleads, for its protection, the powers conferred upon it by the Legislature, as are urged when the obligations imposed by the same charter are insisted upon in the effort to compel such corporations faithfully to perform the duties which they have assumed with respect to the public.

It would be easy to multiply authorities along this line. Indeed, *B. & P. R. Co.* v. *Fifth Baptist Church,* 108 U. S. 517, 27 L. Ed. 730, 2 Sup. Ct. 719, upon which plaintiffs in error justly rely in another aspect of this case, uses the following language:

"Undoubtedly a railway over the public highways of the district, including the streets of the city of Washington, may be authorized by Congress, and if when used with reasonable care it produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars with the noises and disturbances necessarily attending their use, no one can complain that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is *damnum absque injuria.* The private inconvenience in such case must be suffered for the public accommodation."

We shall not press this view of the case further, for counsel for plaintiffs in error state in their brief that they do not "seriously contest" the doctrine enunciated by this court in *Fisher* v. *Railway Company, supra.*

But was the defendant in error acting in its public capacity when it committed the grievances complained of? Every allegation in the declaration is directed against the injuries inflicted by the operation of the power house of the defendant. It is true that an electric railway cannot be operated without a power house; it is true that an engine house is a necessary adjunct to a steam railway; but they are incidents to the operation of the road, with which the public has no concern.

Pollock on Torts, at p. 158 of the 2d ed. of his work, says: "A railway company is authorized to acquire land within specified limits, and on any part of that land to erect workshops. This does not justify the company, as against a particular householder, in building workshops so situated (though within the authorized limits) that the smoke from them is a nuisance to him in the occupation of his house."

In *re Rhode Island R. Co.* (R. I.), 48 Atl. 592, 52 L. R. A. 879, it is said: "The common carrier serves both the public and itself. It has its public and private functions. The public part is the exercise of its franchise for the accommodation of the public; the private part is its incidental business, with which the public is not concerned and which the company manages for its own interest. The company carries passengers over its road as a public duty, but the generation of the power to propel cars is the private business of the company. Whatever is necessary to the exercise of the franchise is for the benefit of the public, but that which pertains simply to means of supply is a private business of the company."

To the same effect is *Louisville & Nashville Terminal Co.* v. *Jacobs* (Tenn.), 72 S. W. 957, 61 L. R. A. 192, where it is said: "But over and beyond this, we think a corporation in selecting a place for its round-house acted in a private capacity,

and is responsible for the injurious consequences which may result from its use."

In *Beseman* v. *Railroad Co., supra,* the court said: "A railroad company in selecting a place for repair shops and engine house acted altogether in its private capacity. Such location was a matter of indifference to the public; and consequently with respect to such an act the corporation stood on the footing of an individual, and was entitled to no superior immunities."

In *Baltimore & Potomac R. Co.* v. *Fifth Bap. Ch., supra,* the Baptist Church claimed that its services were habitually interrupted and disturbed by the hammering noises made in the workshops of the company, the rumbling of its engines passing in and out of them, and the blowing off of steam; that these noises were at times so great as to prevent members of the congregation, sitting in parts of the church farthest from the shops, from hearing what was said; that the act of blowing off steam occupied from five to fifteen minutes, and frequently compelled the pastor of the church to suspend his remarks. The main reliance of the railroad company to defeat the action was the authority conferred upon it by the act of Congress of February 5, 1867, to exercise the same powers, rights, and privileges in the construction of a road in the District of Columbia, the line of which was afterwards designated, which it could exercise under its charter in the construction of a road in Maryland, with some exceptions, not material here. By its charter it was empowered to make and construct all works whatever which might be necessary and expedient in order to the proper completion and maintenance of the road. In its opinion the court says: "It is no answer to the action of the plaintiff that the railroad company was authorized by Act of Congress to bring its track within the limits of the city of Washington, and to construct such works as were necessary and expedient for the completion

and maintenance of its road, and that the engine house and repair shop in question were thus necessary and expedient; that they are skillfully constructed; that the chimneys of the engine house are higher than required by the building regulations of the city, and that as little smoke and noise are caused as the nature of the business in them will permit. In the first place, the authority of the company to construct such works as it might deem necessary and expedient for the completion and maintenance of its road, did not authorize it to place them wherever it might think proper in the city, without reference to the property and rights of others. . . . Whatever the extent of the authority conferred, it was accompanied with this implied qualification, that the works should not be so placed as by their use to unreasonably interfere with and disturb the peaceful and comfortable enjoyment of others in their property. Grants of privileges or powers to corporate bodies, like those in question, confer no license to use them in disregard of the private rights of others, and with immunity for their invasion."

In *Ridge* v. *Railroad Co.* (N. J. Ch), 43 Atl. 276, the *Beseman Case, supra,* and *Railroad Co.* v. *Fifth Bap. Ch., supra,* are considered, and the court says: "In the latter case it was denied by the Supreme Court of the United States that the railroad had been invested with the privilege of building an engine house or repair shop next to a church in the city of Washington. The court held that the grant of power did not authorize the company to place such structure wherever it might think proper in the city without reference to the property or rights of others. The doctrine of that case was approved in the opinion of *Beseman* v. *Railroad Co., supra,* upon the ground that in selecting the place for repair shops the railroad company acted altogether in a private capacity. Such location, it was said, was a matter of indifference to the public, and consequently, with

respect to such act, the corporation stood upon the footing of an individual, and was entitled to no superior immunities. What was meant was that while the public was concerned that a railroad company should have all the appliances, including repair shops, to make its public service effective, it was immaterial to the public where such appliances were placed, so long as the service was efficient. All that concerns the public is to have an efficient service in the way of transportation of persons and freight. The company is shielded from responsibility for incidental damages resulting from acts which are necessary to bring about such service. In the Federal decision it was admitted that the company, by virtue of its franchise, had the right to build repair shops and engine houses, but, having the liberty to choose different sites for its structures, it was bound to select one where they would not inflict an injury upon the property of others."

In *Rapier* v. *London Tramways Company* (1893) L. R., 2 Chy. Div., p. 588, the syllabus of the opinion delivered by Lindley, L. J., is as follows: "The defendants were a tramway company, who were empowered by their act to lay down and construct two lines of tramway according to deposited plans, together with the works and conveniences connected therewith. The act gave no compulsory powers for taking lands, and made no special mention of building stables. The defendants constructed the lines, and built some large blocks of stables near the plaintiff's house for the horses employed in drawing the cars. The plaintiff complained of the smell caused by the stables, and brought an action for an injunction to restrain the defendants from using the stables so as to cause a nuisance. Held: (Affirming the decision of Kekewich, J.), that although horses were necessary for the working of the tramways, the company was not justified by their statutory powers in using

the stables so as to be a nuisance to their neighbors, and that it was no sufficient defense to say that they had taken all reasonable care to prevent it."

Other aspects of this case were discussed before us, upon which we have not deemed it necessary to touch; and without intimating any opinion upon them, except in so far as has been herein expressed, we shall content ourselves for the present with saying that we are of opinion that the Circuit Court should have sustained the demurrer to the special plea.

UPON A PETITION TO REHEAR, FEBRUARY 23, 1906.

KEITH, P.:

In the opinion delivered by the court when the judgment sought to be reviewed by this petition for rehearing was pronounced, it is said:

"The declaration sets forth a nuisance; the defendant justifies what it has done by pleading legislative authority for its acts.

"A public service corporation is to be considered in two aspects. It has duties which it owes to the public, and which it must perform; it has other duties not of a public nature, which are incidental to those of a public character, in the performance of which it stands upon the footing of a private corporation. With respect to the duties of the first class, it may be said that in doing that which under the law it may be required to do, it cannot be considered as doing an unlawful act; and if a lawful act be done without negligence, any injury which it occasions is *damnum absque injuria.*"

This position is earnestly assailed in the petition for a rehearing, where it is broadly asserted that no such distinction

between the public and private functions of a corporation exists, and that all is lawful which the Legislature authorizes to be done, although the authority conferred be not imperative, but merely permissive.

It may be that in the distribution of the duties of a public service corporation into those of a public and those of a private nature, the classification was inaccurate and unscientific, though it has the sanction of courts of the highest respectability. By other courts the same conclusion is reached by a consideration of the language used by the Legislature in the act of incorporation, and by its construction determining whether or not the law-making power intended to permit an act to be done, or to require its performance; to confer a privilege, or to impose a duty.

In the case of *Fisher* v. *Seaboard Air Line Railway Co.*, 102 Va. 363, 46 S. E. 381, the position of this court is well stated in the syllabus. "A railroad company, acting under authority of law, whose road is constructed and operated with judgment and caution, and without negligence, is not liable to an adjacent land owner for damage resulting from the noises, jarring and shaking of buildings, dust and smoke, incident to the running of trains. No action lies for the loss or inconvenience resulting from doing an authorized act in an authorized way." This is to be understood, of course, in the light of the facts presented in that record, where damages were claimed for the noises, jarring and shaking of buildings, dust and smoke incident to the running of trains. We were of opinion that in the absence of negligence, no damages could be recovered, for the reason that the road was obliged to run its trains, which could not be done, whatever the degree of caution exercised, without the inconveniences and injuries enumerated.

In *Makely* v. *Southern Railway Company,* complaint was made of the operation of trains of the defendant company, and of a power house maintained by it for the purpose of lighting the various buildings in its yards.   There was a bill praying an injunction filed in the Circuit Court of Alexandria, which the learned judge of that court refused, but without prejudice to the right of plaintiff to seek her remedy at law.   There was no question made as to the solvency of the railway company, or its ability to respond in any damages which might be adjudged against it.   We concurred with the judge of the Circuit Court in the opinion, that, at least in the preliminary stages of the case, before the right had been established at law, it would be improper to enjoin the defendant company.   And just here it may be proper to state, that while upon a petition for a writ of error or appeal, this court is required to grant the writ prayed for unless the decision called in question be plainly right, we should not overrule the decision of the lower court and grant an injunction which it has refused, unless the error in refusing it be manifest.

We have mentioned the *Fisher Case* and the *Makely Case,* not with any view to vindicating our consistency, but because we felt that it would be well to clear up any doubt that might exist as to the attitude of this court with respect to those decisions.

Coming back to the petition for rehearing, we find the position of the petitioner thus stated:   "The application of this doctrine of 'private capacity' is wholly inconsistent with the principles enunciated in the *Fisher Case.*   We think that the fact that the doctrine is wholly erroneous can easily be demonstrated by stating it in the form of a syllogism, thus:

"The injuries done to property without negligence by a public service corporation, for which it will be held liable, are those done by it in its private capacity.

"All injuries done to property without negligence by a public service corporation are done by it in its private capacity (*i. e.*, by the·means and methods employed).

"Therefore, a public service corporation is liable for all injuries to property done by it without negligence.

"The conclusion is manifestly incorrect, and at least one of the premises must therefore be erroneous. The second premise we think we have demonstrated to be correctly stated—that is, *that injuries to property are the result of the means and methods employed, and not of the public service performed.* The error lies, therefore, in the first premise.

"The vice in this premise, and the simple answer to the various illustrations which we have given above, is demonstrated by a statement of the true principle, which is that a public service corporation, acting without negligence, is not liable for injuries which are the necessary consequences of the performance of its authorized functions. And we need go no further in search for authority for this position than the *Fisher Case* itself, where the court, quoting from Pollock on Torts, said: 'It is settled that no action can be maintained for loss or inconvenience which is the necessary consequence of an authorized thing being done in an authorized manner.' "

We must again advert to the principle that all opinions are to be considered in the light of the facts to which they apply, for the transition from an authorized to an unauthorized act—from that which is lawful to that which is unlawful—is oftentimes by easy and almost imperceptible gradations, so that in the enunciation of a principle the eye must always be kept upon the precise facts upon which it is to operate.

Almost all the questions upon which the law is doubtful or obscure arise at the vanishing point between contradictory and irreconcilable principles, and mark the effort "to deduce har-

mony from the reciprocal struggle of discordant powers."— *Burke*.

Law is not an exact science. It has no invariable standard by which rights may be measured. It does not submit to inflexible rules of logic, nor can it, in its application to the varied affairs of men, always clothe itself in the form of a syllogism; and while we might hesitate to go to the full length of the view expressed by the great moralist we have just quoted, it is to a large extent true that "every human benefit and enjoyment, every virtue and every prudent act, is founded on compromise and barter."

We should not, therefore, have been disposed to abandon our position, even though it had failed when subjected to the syllogistic test; but we are not prepared to admit that the test has been correctly applied. We do not admit the truth of the minor premise—we do not admit that all injuries done to property without negligence, by public service corporations, are done by them in their private capacity.

All injuries done to property, without negligence, by a public service corporation *for which it will be held liable,* it may, perhaps, be conceded are done by it in its private capacity; but there are injuries done by it in its public capacity for which it will not be held liable, and in that distinction is to be found the very gist of this controversy.

Nor can we concur in the answer which the petitioner suggests to the illustrations which it had given. We cannot admit that a public service corporation, acting without negligence, is, under all circumstances, irresponsible for injuries which are the necessary consequence of the performance of its authorized functions. There must be something more than authority to do the act complained of. It must be an act which the corporation is required to perform—a duty it owes and which has been

imposed upon it by the legislative act granting the charter by which it exists—or at least it must appear that the particular act complained of and immunity from its consequences were within the contemplation of the Legislature. It is true that in Pollock on Torts, quoted in the *Fisher Case, supra,* it is said that "no action can be maintained for loss or inconvenience which is the necessary consequence of an authorized thing being done in an authorized manner"; but Pollock also says, in his second edition, at p. 158, "A railway company is authorized to acquire land within specified limits, and on any part of that land to erect workshops. This does not justify the company, as against a particular householder, in building workshops so situated (though within the authorized limits) that the smoke from them is a nuisance to him in the occupation of his house." The two statements by the same author are apparently opposed to each other, and yet may be in entire harmony as applied to varying conditions of facts.

In *Managers of the Metropolitan Asylum District* v. *Hill* (1880-'81), 6 App. Cas. L. R. 193, the Metropolitan Poor Act, authorizing the formation of districts and district asylums for the care and cure of sick and infirm poor, created corporations for that purpose, and gave authority to the Poor Law Board to issue directions to these corporations, enabled them to purchase lands and erect buildings for the purposes of the act, and made the rates of parishes and unions liable for the outlay thus incurred. But it does not by direct and imperative provisions, order these things to be done, so that if, in doing them, a nuisance is created to the injury of the health or property of persons resident in the neighborhood of the place where the land is purchased or the buildings erected, it does not afford to these acts a statutory protection. And, therefore, where such nuisance was found as a fact, it was held that the district board

could not set up the statute, nor the orders of the poor law board under it, as an answer to an action, or to prevent an injunction issuing to restrain the board from continuing the nuisance; and in continuing his opinion Lord Blackburn states this principle: "On those who seek to establish that the Legislature intended to take away the private rights of individuals, lies the burden of showing that such an intention appears by express words or necessary implication." And per Lord Watson it was said: "Where the terms of a statute are not imperative, but permissive, the fair inference is that the Legislature intended that the discretion, as to the use of the general powers thereby conferred should be exercised in strict conformity with private rights."

That case finely illustrates the effect of a statute merely permissive in its terms.

In *London, Brighton & South Coast Ry. Co.* v. *Truman and others,* L. R. 11, App. Cas. 45, a railway company was authorized, among other things, to carry cattle, and to purchase by agreement, in addition to the lands which they were empowered to purchase compulsorily, any lands not exceeding in the whole fifty acres, in such places as should be deemed eligible, for the purpose of providing additional stations, yards, and other conveniences for receiving, loading, or keeping any cattle, goods, or things conveyed or intended to be conveyed by the railway, or for making convenient roads or ways thereto, or for any other purposes connected with the undertaking which the company should judge requisite. The company were also empowered to sell such additional lands and to purchase in lieu thereof other lands which they should deem more eligible for the aforesaid purposes, and so on from time to time. The act contained no provision for compensation in respect of lands so purchased by agreement. Under this power the company, some years after

the expiration of the compulsory powers, bought land adjoining one of their stations and used it as a yard or dock for their cattle traffic. To the occupiers of houses near the station the noise of the cattle and drovers was a nuisance which, but for the act, would have been actionable. There was no negligence in the mode in which the company conducted the business. Held: That the purpose for which the land was acquired being expressly authorized by the act, and being incidental and necessary to the authorized use of the railway for the cattle traffic, the company were authorized to do what they did, and were not bound to choose a site more convenient to other persons; and that the adjoining occupiers were not entitled to an injunction to restrain the company, distinguishing between the case of *Metropolitan Asylum Dist.* v. *Hill,* just cited. Among those who delivered opinions in this case was Lord Blackburn, from whom we have just quoted, who says, in part: "I do not think there can be any doubt that if on the true construction of a statute it appears to be the intention of the Legislature that powers should be exercised, the proper exercise of which may occasion a nuisance to the owners of neighboring land, and that this should be free from liability to an action for damages, or an injunction to prevent the continued proper exercise of these powers, effect must be given to the intention of the Legislature," again resting the case upon a proper construction of the act of incorporation. In this case the House of Lords reversed the decisions of the Court of Appeal, and of North, J., which is to be found in 25 Ch. Div. 426. It undertakes to distinguish, while it does not overrule *Metropolitan Asylum Dist.* v. *Hill,* 6 App. Cas., *supra;* and seems to rest upon the express terms of the Act of Parliament under consideration. It is at most merely persuasive authority, and if it decides that a merely permissive authority, from the Legislature confers complete im-

munity from acts which constitute a nuisance, if not negli-
gently performed, it would be irreconcilable with other English
cases of high authority—indeed of equal authority with itself—
with the decisions of the Supreme Court of the United States,.
and with those of State courts, to which we shall presently
advert.

In *Cogswell* v. *Railroad Co.,* 103 N. Y. 10, the syllabus is as.
follows: "Whether the Legislature can authorize a railroad cor-
poration to maintain an engine house, under circumstances·
which, if maintained by an individual, would, by the common
law, constitute a nuisance to private property without providing·
compensation, *quaere.*

"But if this should be conceded, nevertheless the statutory·
sanction which will justify an injury by a railroad corporation·
to private property without making compensation therefor, and'
without the consent of the owner, must be express or given by
clear and unquestionable implication from the powers expressly·
conferred, so that it can fairly be said that the Legislature con-
templated the doing of the very act which occasioned the injury;·
it may not be presumed from a general grant of authority.

"Where the terms of a statute giving authority to such a cor-
poration are not imperative, but permissive, this does not confer·
license to commit a nuisance, although what is contemplated by·
the statute cannot be done without."

In *Bohan* v. *Port Jervis Gas-Light Company,* 122 N. Y., at·
p. 18, 25 N. E. at p. 246, 9 L. R. A. 711, it is said that "al--
though the acts complained of are inseparably connected with
the carrying on of the business itself, and the·resulting damages·
a necessary consequence, if those acts constitute a nuisance *per-*
*se,* it is not necessary to show negligence in order to sustain a.
recovery.

"Every person is bound to make a reasonable use of his property, having respect for his neighbor's right; a use which produces destructive vapors and noxious smells, resulting in material injury to the property and the comfort of those dwelling in the neighborhood, is not reasonable, and is a nuisance *per se.*

"As a general rule, corporations authorized by statute to carry on a business, although it may be of a *quasi* public character, are under the same obligations to make a reasonable use of their property and to respect the rights of others as are citizens.

"While the Legislature may authorize acts, which would otherwise be a nuisance, when they affect or relate to matters in which the public have an interest or over which they have control, the statutory authority which affords immunity for such acts must be express, or a clear and unquestionable implication from powers expressly conferred, and it must appear that the Legislature contemplated the doing of the very act which occasioned the injury."

This whole subject is considered by the Supreme Court of the United States in *Baltimore & Potomac R. Co.* v. *Fifth Baptist Church,* 108 U. S. 317, 27 L. Ed. 739, 2 Sup. Ct. 719, which was decided in 1883, and has met with general approval. The Baltimore & Potomac Railroad Company was authorized by Act of Congress to lay its track within the limits of the city of Washington, and to construct other works necessary and expedient to the proper completion and maintenance of its road. It erected an engine house and machine shop on a parcel of land immediately adjoining the church, and used them in such a way as to disturb, on Sundays and other days, the congregation assembled in the church, to interfere with religious exercises therein, break up its Sunday schools, and destroy the value of the building as a place of public worship. Suit was brought against the railroad company to recover damages, and among

other defenses the company relied upon statutory authority; and its counsel undertook to maintain that "no action will lie and no recovery can be had for doing that which the law authorizes the party to do, and that cannot be adjudged a nuisance and be held unlawful which the law declares to be lawful." Answering that contention, Mr. Justice Field says: "The authority of the company to construct such works as it might deem necessary and expedient for the completion and maintenance of its road did not authorize it to place them wherever it might think proper in the city, without reference to the property and rights of others. As well might it be contended that the act permitted it to place them immediately in front of the President's house or of the Capitol, or in the most densely populated locality. Indeed, the corporation does assert a right to place its works upon property it may acquire anywhere in the city. Whatever the extent of the authority conferred, it was accompanied with this implied qualification, that the works should not be so placed as by their use to unreasonably interfere with and disturb the peaceful and comfortable enjoyment of others in their property. Grants of privileges or powers to corporate bodies, like those in question, confer no license to use them in disregard of the private rights of others, and with immunity for their invasion. The great principle of the common law, which is equally the teaching of Christian morality, so to use one's property as not to injure others, forbids any other application or use of the rights and powers conferred.

"Undoubtedly, a railway over the public highways of the District, including the streets of the city of Washington, may be authorized by Congress, and if when used with reasonable care it produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars with the noises and disturbances necessarily attending their

use, no one can complain that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is *damnum absque injuria.* The private inconvenience in such case must be suffered for the public accommodation."

It is said in the petition that the latter part of this quotation is a dictum. We hardly think so; but even if it were, it is the dictum of a judge whose great ability entitles his every utterance to the highest respect, and is sanctioned by the concurrence of the entire court. We may safely consider that, opinion as expressing the fixed views of the Supreme Court of the United States upon the questions discussed.

The legislative authority relied upon in this case (Acts 1897-'98, pp. 495 and 1020, respectively) is as follows:

At section 2, page 496, occurs the following language: "The said company shall have power to construct, lease, purchase or acquire by consolidation with any other company or companies, and operate and maintain in the city or county of Norfolk, or both, and in any other city, town or village in the said county, suitable works, machinery and plants for the manufacture of electricity, and for the sale and distribution of the same; and it shall have power to sell and distribute the same for public and private illumination, for heating, for power and for any other purposes which the same may be used for, and it shall have power to do such acts and things, and conduct such enterprises as are convenient in connection with or incidental to the enjoyment of the powers hereinabove conferred, and may, with the consent of the proper authorities of the city of Norfolk, and of such other city, or town, or county as are named above, use the streets and roads thereof for laying its mains, pipes and wires and erecting its poles."

And at section 3, p. 1020, it is declared that "The said company is authorized to promote, establish and maintain the busi-

ness of a general railway and electrical company.  To erect, maintain and operate plants in this State for the generation of electricity and the supply of electric current for its own use and for sale to persons, natural or artificial," etc.

In these quotations is found the sole authority of the defendant, to permit or to require, to excuse or to justify it in the performance of the acts complained of in this suit.  The. case is, therefore, plainly to be classed with *B. & P. R. Co.* v. *Fifth Baptist Church, supra,* and other cases which we have cited, in which the effect of legislative authority has been discussed.  It will be seen that the language is not imperative, but permissive, and that it does not confer statutory sanction for the commission of a nuisance in any way whatever, and most assuredly cannot be said to confer it in express terms, "or by clear and unquestionable implication from the powers given," so that it cannot be fairly said that "the Legislature contemplated the doing of the very act which occasioned the injury, and immunity is not to be presumed from a general grant of authority."

But it is said that the decision in this case, if permitted to stand, will "practically debar the use of many of the most important and developing features of our modern growth."

It would be a source of regret if, in the administration of justice by the establishment and enforcement of sound principles, the prosperity of our people should be hindered or checked, but it would be not only a source of regret, but of reproach, if material prosperity were stimulated and encouraged by a refusal to give to every citizen a remedy for wrongs he may sustain, even though inflicted by forces which constitute factors in our material development and growth.  Courts have no policies, and cannot permit consequences to influence their judgments further than to serve as warnings and incentives to thor-

---
**Opinion.**

---

ough investigation and careful consideration of the causes submitted to them. Those duties being faithfully performed, courts may await the result with patience, if not always with confidence, and say with the great Lord Mansfield, *"Fiat justitia, ruat coelum."*

*Reversed.*

*Rehearing denied.*